BRIAN L. WILLIAMS
*Pro Hac Vice*
JEMMA E. DUNN
Nevada Bar No. 16229
MATTHEW T. HALE
Nevada Bar No. 16880
PHILIP A. HORLACHER
Nevada Bar No. 16891
**GREENBERG GROSS LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 730
Las Vegas, Nevada 89135
Telephone: (702) 777-0888
Facsimile: (702) 777-0801
*BWilliams@GGTrialLaw.com*
*JDunn@GGTrialLaw.com*
*MHale@GGTrialLaw.com*
*PHorlacher@GGTrialLaw.com*

*Attorneys for Plaintiff April Isas*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| APRIL ISAS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CHIPOTLE SERVICES LLC, a California limited liability company; CHIPOTLE MEXICAN GRILL, INC., a California corporation,<br><br>Defendants. | Case No. 2:24-cv-02305-JAD-DJA<br><br>**PLAINTIFF APRIL ISAS'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN SUPPORT OF MOTION TO COMPEL THE DEPOSITION OF SCOTT BOATWRIGHT (ECF NO. 111)**<br><br>Hearing Date: September 29, 2026<br>Time: 10:00 a.m.<br>Courtroom: 3A<br>Magistrate Judge Daniel J. Albregts |

Plaintiff April Isas ("Plaintiff" or "Ms. Isas"), by and through her counsel of record, Greenberg Gross LLP, respectfully moves under Local Rule 7-2(g) for leave to file supplemental evidence in support of her Motion to Compel the Deposition of Scott Boatwright (ECF No. 111) (the "Motion"), which is set for hearing before Magistrate Judge Daniel J. Albregts on September 29, 2026. The proposed supplemental evidence consists of excerpts from the September 2, 2026 deposition of Mark Watkins, Chipotle's former Regional Vice President for the Pacific South region, who supervised Ms. Isas from April 2023 through her termination and who reported directly to Mr.

Boatwright. The deposition was taken two days after briefing on the Motion closed, and the certified transcript was delivered on September 15, 2026. Plaintiff's proposed Supplement is attached as **Exhibit A**, the supporting Declaration of Matthew T. Hale as **Exhibit B**, and the deposition excerpts as **Exhibit C**. Because the underlying Motion is set for hearing on September 29, 2026, Plaintiff is concurrently filing a separate motion under LR IA 6-1(d) for an order shortening Chipotle's time to respond to this Motion. This Motion is based on the following Memorandum of Points and Authorities, the exhibits hereto, the papers and pleadings on file, and any argument the Court may entertain.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Chipotle opposed the Motion on two grounds: that Mr. Boatwright lacks unique, firsthand knowledge of the events at issue, and that Plaintiff had not first deposed "lower-level employees with potentially relevant knowledge," a group Chipotle identified by name to include "Mark Watkins." Opp'n (ECF No. 117) at 12. Plaintiff has now deposed Mr. Watkins. His testimony bears directly on both issues, and it could not have been presented earlier because it did not yet exist when Plaintiff filed her Reply on August 31, 2026 (ECF No. 118).

Mr. Watkins testified that when he took over the region in April 2023, Mr. Boatwright told him, "I don't trust April and I don't want her on my team," and that Mr. Watkins "should put her on a plan." Watkins Dep. (Ex. C) 97:4–9, 97:17–20. He testified that Mr. Boatwright reserved to himself the authority to approve any promotion or termination of a director, including Ms. Isas. *Id.* 58:11–18, 187:8–11, 188:10–12. He testified that, alone with him on the corporate jet, after Mr. Watkins had shown Mr. Boatwright that another director ranked below Ms. Isas, Mr. Boatwright still pressed for Ms. Isas's PIP and offered: "if you want me to fly to Las Vegas with you to put April on a PIP, I'll go with you." *Id.* 117:3–11, 118:6–17. And he testified that when Ms. Isas produced a doctor's note clearing her to return from medical leave, Mr. Boatwright said, "I'm going to take care of it," after which, Mr. Watkins understood, the company's posture shifted from returning Ms. Isas to work to negotiating her exit and terminating her. *Id.* 46:4–47:12, 146:23–147:6.

That testimony cannot be reconciled with the declaration Chipotle filed to avoid the

deposition, in which Mr. Boatwright attests that he "would not make staffing decisions regarding Team Directors," "did not make staffing decisions related to April Isas's employment," and does "not recall being involved in the decision to terminate Ms. Isas's employment." Boatwright Decl. (ECF No. 117-2) ¶¶ 18–20. It also answers Chipotle's exhaustion argument on Chipotle's own terms: the subordinate witness Chipotle said Plaintiff should examine first has been examined, and he confirmed that the decisions at issue were Mr. Boatwright's to make and that "[t]here's no communication between Scott and me that you're going to be able to find in writing about this." Watkins Dep. (Ex. C) 121:5–14. Good cause exists to place this evidence before the Court.

## II. RELEVANT PROCEDURAL BACKGROUND

Plaintiff first noticed Mr. Boatwright's deposition on November 25, 2025. (ECF No. 111-1, ¶ 13, Ex. 11). After months of meet-and-confer efforts, Plaintiff filed the Motion on August 10, 2026, supported by the Declaration of Philip A. Horlacher (ECF No. 111-1) and the Declaration of April Isas (ECF No. 112). On August 13, 2026, the Court set the Motion for hearing on September 29, 2026. ECF No. 114.

Chipotle filed its Opposition on August 24, 2026, supported by, among other things, the deposition transcript of Matthew Wanstreet (ECF No. 117-1) and the Declaration of Scott Boatwright (ECF No. 117-2). Chipotle argued that the Motion was "premature" because Plaintiff had not deposed "lower level employees with potentially relevant knowledge, including Mark Watkins, Ileana Huerta, Jean-Rose Bishop, Apple Musni, and Tawanda Starms." Opp'n at 12. Plaintiff filed her Reply on August 31, 2026. ECF No. 118.

Two days later, on September 2, 2026, Plaintiff took the videotaped deposition of Mr. Watkins. Declaration of Matthew T. Hale ("Hale Decl.") (Ex. B) ¶ 3. Chipotle's counsel attended and defended the deposition. *Id.* The certified transcript was delivered on September 15, 2026, and Plaintiff brings this Motion the same day, two weeks before the hearing. *Id.* ¶¶ 4–5. The discovery cutoff is October 30, 2026. ECF No. 116.

## III. LEGAL STANDARD

Local Rule 7-2(g) provides that "[a] party may not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause. The judge may strike

supplemental filings made without leave of court." LR 7-2(g). The rule requires a motion for leave rather than a unilateral filing, *Alps Prop. & Cas. Ins. Co. v. Kalicki Collier, LLP*, 526 F. Supp. 3d 805, 812 (D. Nev. 2021), and "[a] court may grant such a request for good cause." *Id.* (quoting *Ra Se. Land Co. LLC v. First Am. Title Ins. Co.*, No. 2:14-cv-01621-MMD-NJK, 2016 WL 4591740, at *2 (D. Nev. Sept. 2, 2016)).

Good cause exists when the proffered material "controls the outcome of the litigation, or . . . is particularly persuasive or helpful." *Id.* (citing *Hunt v. Washoe Cty. Sch. Dist.*, No. 3:18-cv-00501-LRH-WGC, 2019 WL 4262510, at *3 (D. Nev. Sept. 9, 2019)); *accord N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nev. Gaming Control Bd.*, No. 2:25-cv-00978-APG-BNW, 2026 U.S. Dist. LEXIS 28173, at *5 (D. Nev. Feb. 9, 2026); *Willis v. Falkner*, No. 2:22-cv-01154-CDS-BNW, 2025 U.S. Dist. LEXIS 259566, at *3 (D. Nev. Dec. 15, 2025). Courts in this District apply that standard to supplemental evidence as well as supplemental authority, and decline "to impose a narrow reading" of the rule's reference to "supplemental pleadings, briefs, authorities, or evidence." *N. Am. Derivatives Exch.*, 2026 U.S. Dist. LEXIS 28173, at *5–6 (granting leave where the proffered material "bears on similar issues" and "relates to issues in the pending motion"); *Willis*, 2025 U.S. Dist. LEXIS 259566, at *3–4 (granting leave to file supplemental exhibits in support of a fully briefed motion for summary judgment, and noting the court's "inherent authority to manage and control the docket" (citing *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010))).

The court also considers the movant's diligence. *Mallia v. Drybar Holdings, LLC,* No. 2:19-cv-00179-RFB-DJA, 2020 U.S. Dist. LEXIS 46358, at *9–10 (D. Nev. Mar. 16, 2020) ("The Court will typically only find good cause under LR 7-2(g) if there is a showing that the party seeking good cause was reasonably diligent.").

## IV. <u>ARGUMENT</u>

### A. <u>The Watkins Testimony Is New Evidence That Could Not Have Been Presented With the Briefing.</u>

The proposed supplement is not an attempt to reargue the Motion or to introduce evidence Plaintiff could have marshaled earlier. Mr. Watkins was deposed on September 2, 2026, after

Plaintiff's Reply was filed on August 31, 2026. Hale Decl. ¶ 3. The testimony did not exist when briefing closed. Plaintiff filed this Motion on the day the certified transcript was delivered, two weeks before the hearing. *Id.* ¶¶ 4–6, 8. That is the diligence Rule 7-2(g) contemplates.

Nor is the timing of Plaintiff's making. Chipotle insisted that Mr. Watkins and other subordinates be deposed before Mr. Boatwright, Opp'n at 11–12, and Plaintiff agreed months ago that Mr. Boatwright's deposition would proceed "on the back end of depositions being scheduled." ECF No. 117-9 at 1. Having demanded that sequence, Chipotle cannot fairly object when the sequence produces evidence after the briefing deadline. The Court should have the benefit of what the deposition Chipotle asked for actually revealed.

**B. <u>The Testimony Bears Directly on Both Issues Chipotle Placed in Dispute.</u>**

**1. Unique, firsthand knowledge.**

Chipotle's central contention is that Mr. Boatwright has, at most, "limited unique knowledge of anything having to do with the claims or defenses in this matter." Opp'n at 3. Mr. Watkins, the person Chipotle says made the relevant decisions, testified otherwise. He testified that no director could be promoted or terminated without Mr. Boatwright's involvement, Watkins Dep. (Ex. C) 58:11–18, 187:8–11; that Mr. Boatwright directed him to place Ms. Isas on a performance improvement plan and expressed distrust of her, *id.* 97:4–20, 115:25–116:5; that Mr. Boatwright wanted Ms. Isas placed on a PIP even after being shown that another director ranked below her, and offered to fly to Las Vegas to deliver the PIP personally, *id.* 117:3–11, 118:6–17; and that Mr. Boatwright said he would "take care of it" when Ms. Isas sought to return from leave, after which the company chose termination over reinstatement, *id.* 46:4–47:12, 146:23–147:6. Mr. Watkins also testified that he did not know what was "in Scott's head," *id.* 116:15–16, and that nothing about these conversations was put in writing, *id.* 121:5–14. Only Mr. Boatwright can supply that testimony. No Rule 30(b)(6) designee and no subordinate can testify to what Mr. Boatwright believed, intended, or decided.

**2. Exhaustion of less intrusive discovery.**

Chipotle argued the Motion was premature because Plaintiff had not yet deposed lower-level employees, and it named Mr. Watkins first among them. Opp'n at 11. That deposition has now been

taken. Rather than eliminating the need for Mr. Boatwright's testimony, it confirmed that the disputed decisions ran through Mr. Boatwright. The supplement therefore goes to the precise factor Chipotle asked the Court to weigh, and it demonstrates that the *Padilla* requirement that the movant "at least depose[] lower-level employees" has been satisfied. *Padilla v. MGM Grand Hotel, LLC*, No. 2:22-cv-02109-RFB-EJY, 2025 WL 2772072, at *6 (D. Nev. Sept. 25, 2025) *(*quoting *Int'l Game Tech. v. Ill. Nat'l Ins. Co.*, No. 2:16-cv-02792-APG-NJK, 2018 WL 7499823, at *4, n.3 (D. Nev. Apr. 6, 2018)).

**3. The Boatwright Declaration.**

Chipotle relies on Mr. Boatwright's declaration as a substitute for his testimony. The Watkins deposition shows why a declaration drafted by counsel is no substitute. Mr. Boatwright attests that he "would not make staffing decisions regarding Team Directors" and "did not make staffing decisions related to April Isas's employment." Boatwright Decl. ¶¶ 18–19. Mr. Watkins testified that Mr. Boatwright required his sign-off on any director termination and told Mr. Watkins to put Ms. Isas on a plan. Watkins Dep. (Ex. C) 58:11–18, 97:4–9, 187:8–11. Mr. Boatwright attests that he does "not recall being involved in the decision to terminate Ms. Isas's employment." Boatwright Decl. ¶ 20. Mr. Watkins testified that Mr. Boatwright told him "I'm going to take care of it" when Ms. Isas sought to return, and that the decision to terminate rather than reinstate her followed. Watkins Dep. (Ex. C) 46:4–47:12, 146:23–147:6. Mr. Boatwright attests that Mr. Wanstreet "resigned." Boatwright Decl. ¶ 8. Mr. Watkins testified that he was told the week before that Mr. Wanstreet "was being fired," that Mr. Boatwright told him the decision to replace Mr. Wanstreet was "mine," and that the transition conversations were "cover for him being able to look like he resigned." Watkins Dep. (Ex. C) 61:6–18, 94:19–95:3. These are precisely the conflicts that cross-examination exists to resolve.

**C. <u>Chipotle Will Suffer No Prejudice.</u>**

Chipotle's counsel noticed the deposition on its calendar, attended it, and defended it. Hale Decl. ¶ 3. Chipotle has the same certified transcript. The proposed Supplement is brief and confined to the Watkins testimony; it raises no new legal theories. The hearing is fourteen days away, and Plaintiff does not object to Chipotle filing a short response to the Supplement before the hearing on

a schedule the Court deems appropriate. The alternative, deciding a motion about whether an executive has unique personal knowledge without the testimony of the executive's direct report about that very subject, would disserve the Court and the parties.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant leave under LR 7-2(g) and deem Exhibits A through C filed as Plaintiff's Supplement to the Motion to Compel the Deposition of Scott Boatwright (ECF No. 111), or, in the alternative, direct Plaintiff to file the Supplement and its exhibits within one business day of the Court's order.

DATED: September 15, 2026

**GREENBERG GROSS LLP**

By: *\/s/ Matthew T. Hale*
BRIAN L. WILLIAMS
*Pro Hac Vice*
JEMMA E. DUNN
Nevada Bar No. 16229
MATTHEW T. HALE
Nevada Bar No. 16880
PHILIP A. HORLACHER
Nevada Bar No. 16891
*Attorneys for Plaintiff April Isas*

IT IS SO ORDERED.

DATED: September 25, 2026

DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically transmitted the foregoing **PLAINTIFF APRIL ISAS'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN SUPPORT OF MOTION TO COMPEL THE DEPOSITION OF SCOTT BOATWRIGHT (ECF NO. 111)** to the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, including the following:

Nicholas D. Crosby, Esq.
Jordan W. Montet, Esq.
MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
ncrosby@maclaw.com
jmontet@maclaw.com

Betsy Bulat, Esq. (admitted pro hac vice)
Robert J. Mollohan, Jr., Esq. (admitted pro hac vice)
Colyer F. Montgomery, Esq.
MARTENSON, HASBROUCK & SIMON LLP
2573 Apple Valley Road NE
Atlanta, Georgia 30319
bbulat@martensonlaw.com
rmollohan@martensonlaw.com
cmontgomery@martensonlaw.com
*Attorneys for Defendants*

Executed on September 15, 2026, at Las Vegas, Nevada.

*/s/ Matthew T. Hale*
An Employee of Greenberg Gross LLP

# EXHIBIT A

[Proposed] Plaintiff April Isas's Supplement to Motion to Compel the Deposition of Scott Boatwright (ECF No. 111)

BRIAN L. WILLIAMS
*Pro Hac Vice*
JEMMA E. DUNN
Nevada Bar No. 16229
MATTHEW T. HALE
Nevada Bar No. 16880
PHILIP A. HORLACHER
Nevada Bar No. 16891
**GREENBERG GROSS LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 730
Las Vegas, Nevada 89135
Telephone: (702) 777-0888
Facsimile: (702) 777-0801
*BWilliams@GGTrialLaw.com*
*JDunn@GGTrialLaw.com*
*MHale@GGTrialLaw.com*
*PHorlacher@GGTrialLaw.com*

*Attorneys for Plaintiff April Isas*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| APRIL ISAS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CHIPOTLE SERVICES LLC, a California limited liability company; CHIPOTLE MEXICAN GRILL, INC., a California corporation,<br><br>Defendants. | Case No. 2:24-cv-02305-JAD-DJA<br><br>**[PROPOSED] PLAINTIFF APRIL ISAS'S SUPPLEMENT TO MOTION TO COMPEL THE DEPOSITION OF SCOTT BOATWRIGHT (ECF NO. 111)**<br><br>Hearing Date: September 29, 2026<br>Time: 10:00 a.m.<br>Courtroom: 3A<br>Magistrate Judge Daniel J. Albregts |

Pursuant to the Court's order granting leave under Local Rule 7-2(g), Plaintiff April Isas submits this Supplement to her Motion to Compel the Deposition of Scott Boatwright (ECF No. 111) (the "Motion") to place before the Court excerpts from the September 2, 2026 deposition of Mark Watkins, Chipotle's former Regional Vice President for the Pacific South region. Mr. Watkins supervised Ms. Isas from April 2023 through her termination and reported directly to Mr. Boatwright. Boatwright Decl. (ECF No. 117-2) ¶ 5; Watkins Dep. (Ex. C) 37:1–3. The excerpts are attached as Exhibit C to the Declaration of Matthew T. Hale (Ex. B).

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. THE WATKINS TESTIMONY

### A. Mr. Boatwright Told Mr. Watkins He Did Not Trust Ms. Isas and Directed That She Be Placed on a Performance Improvement Plan.

Chipotle told the Court that Mr. Boatwright "would defer to the appropriate leadership teams responsible for overseeing Chipotle's various regions to make staffing decisions regarding Team Directors within their assigned region." (ECF No. 117-2, Boatwright Decl. ¶ 18). The leader of the team responsible for Ms. Isas testified to the opposite:

**Watkins Dep. (Ex. C) 97:4–9, 97:17–20:**
A. When I took over, Scott told me that he doesn't trust April and doesn't want her on his team, and that I should put her on a plan. I told her I was aware that she was supposed to be on a plan by Matt, and Matt never did it. I told Scott it was a bad idea to put April on a plan.
. . .
Q. You recall him saying the words he doesn't – that I don't trust April?
A. I don't trust April and I don't want her on my team. That was the quote from him.

Mr. Watkins understood the distrust to stem from Ms. Isas's recordings of Mr. Wanstreet, the very recordings Ms. Starms had sent to Mr. Boatwright weeks earlier. *Id.* 97:11-13, 114:16–115:8; Horlacher Decl. (ECF No. 111-1) Exs. 4, 5. Mr. Watkins told Mr. Boatwright that putting Ms. Isas on a plan was "a bad idea," in part because he "was aware that we're putting ourselves at a retaliation risk by PIPing her." Watkins Dep. (Ex. C) 98:12–15, 116:3–5 ; *see also id.* 120:5–8 ("It was stupid to have a sexual harassment complainer go on a PIP if she's not the worst person."). Mr. Boatwright's answer was "I'll leave it to you," which Mr. Watkins understood as Mr. Boatwright "deflecting" and "being politically savvy." *Id.* 98:16–19, 116:20–23.

When Mr. Watkins showed Mr. Boatwright a scorecard demonstrating that Ms. Isas was not the lowest-ranked director, *id.* 100:22–101:25, 117:3–9, the "next thing" he received was a call from Mr. Boatwright's assistant scheduling Mr. Watkins to accompany Mr. Boatwright to the San Jose market run by the lowest-ranked director, Ashley Gibbs. *Id.* 117:6–11. The visit went badly, and on the flight home Mr. Boatwright told Mr. Watkins that if he were Ms. Gibbs's boss he "would fire

her today on the spot." *Id.* 117:15–25. Mr. Watkins used the moment to press Mr. Boatwright on the inconsistency of PIPing Ms. Isas when Ms. Gibbs ranked below her:

> **<u>Watkins Dep. (Ex. C) 118:6–17:</u>**
> A. . . . And then I said – then I told him, I go: I'm not really sure what to do here. You want me to put April on a PIP, but Ashley needs to go first. Ashley – I go: If I put Ashley on a PIP it's going to be 90 days of this, and April's going to be 90 days out. And I go: If we do April first it's not savvy. I could do both of them at the same time, and that would be a logistic nightmare. It's all crazy.
> At that point he said: You should put – you should put Ashley on a PIP, and if you want me to fly to Las Vegas with you to put April on a PIP, I'll go with you.

Mr. Watkins declined the offer because "[m]y job is to protect you, not put you – expose you." *Id.* 118:20–23. He testified that he "didn't want to do either one of" the PIPs, that he "told it to Scott, too," and that "we ended up making the decision to do it together. And it was my call at the end. I made it, and Scott liked it." *Id.* 119:15–19. Weeks later, Ms. Isas received the first performance improvement plan of her twenty-year career. (ECF 111-1, Horlacher Decl., Ex. 7.)

Mr. Boatwright's animus was not confined to Ms. Isas. Mr. Watkins testified that Mr. Boatwright deprioritized the development of another director, Bryan Duff, in part because of "the risk he has with – with being inappropriate speaking to April." Watkins Dep. (Ex. C) 93:8–19. And Mr. Watkins testified that Mr. Boatwright would "slide and make a comment about April or Matt in front of the RVPs" at regional meetings, conduct Mr. Watkins found so inappropriate that his "attitude" was "Shut up." *Id.* 37:14–16, 38:3–9.

### B. <u>Mr. Boatwright Retained Approval Authority Over Any Director's Termination.</u>

Mr. Boatwright attests that he "did not make staffing decisions related to April Isas's employment." ECF No. 117-2, Boatwright Decl. ¶ 19. Mr. Watkins testified that the authority to make those decisions was never his to begin with:

> **<u>Watkins Dep. (Ex. C) 58:10–16; 187:8–11; 188:10–12:</u>**
> Q. What was the content of that conversation?
> A. He let me know his leadership style, that he would give me carte blanche to run my business unit, that I had discretion to promote or terminate anybody, except for directors. The only thing he asked for is that I don't promote or terminate a director without his involvement.
> . . .
> A. I had no authority to terminate any director at any time. Scott Boatwright was very

> clear: You have carte blanche to run your business unit. Don't fire or promote a director without engaging me.
>
> . . .
>
> A. I didn't have the authority to terminate a director in any case. It all had to be signed off by HR, legal, and Scott.

Mr. Watkins likewise testified that "there's nothing that ever was done around anybody's PIP, especially directors and above, that HR, legal, and operations were not all three tied at the hip and had a consensus," and that "operations" meant "[m]e and my boss, Scott Boatwright." *Id.* 36:17–37:3.

**C. <u>"I'm Going to Take Care of It": Mr. Boatwright and the Decision Not to Return Ms. Isas From Leave.</u>**

Mr. Boatwright attests that he does "not recall being involved in the decision to terminate Ms. Isas's employment" and "only recall[s] being informed of the decision before it became effective." ECF No. 117-2, Boatwright Decl. ¶ 20. Mr. Watkins testified that throughout Ms. Isas's leave, Mr. Boatwright repeatedly asked him "what's going on" with Ms. Isas, Watkins Dep. (Ex. C) 43:15–23, 52:23–53:2, 86:10–13, and that when Mr. Watkins reported that Ms. Isas was allegedly communicating with her team during leave, Mr. Boatwright responded, "That's not good." *Id.* 92:16–93:5. Then, in or about October 2023, Ms. Isas submitted a doctor's note clearing her return:

> **<u>Watkins Dep. (Ex. C) 46:13–47:5:</u>**
> And then at that point it was one of those conversations where Scott asked me what's going on. I go: April brought a note. She's coming back. And at that point Scott wanted to know what we're going to do in Vegas with her back. . . . And so Scott said: I'm going to take care of it. And he had, to my understanding from Ileana, he had a conversation with Roger Theodoredis, the chief legal officer, who had a conversation with Ashley Coleman, who is the director of legal and a lawyer, and that conversation was to terminate April.

Mr. Watkins understood from Chipotle's HR Business Partner, Ileana Huerta, that Mr. Boatwright spoke with the Chief Legal Officer "on the plane back from New York," that the Chief Legal Officer "overruled Ashley Coleman and said she's not coming back," and that "the conversation shifted from accepting her back from LOA to negotiating her exit." *Id.* 146:23–147:6, 147:21–148:9. Mr. Watkins, a forty-year operations veteran, was "very surprised" because he had "never seen anybody go out on LOA, get a doctor's note, ready to return, and get terminated." *Id.*

48:5–14. He was later directed by legal to "go to Workday and press this button," after which he told Mr. Boatwright, "Hey, it's over. It's done. They had me terminate her." *Id.* 50:10–17, 53:11–21.

Mr. Watkins was candid about the limits of his own knowledge: Mr. Boatwright "typically was in a collect information mode not a give information mode," and Mr. Watkins does not know "what's in Scott's head." *Id.* 54:14–19, 116:15–16. What Mr. Boatwright meant by "I'm going to take care of it," whom he spoke to, and what he said are questions only he can answer.

### D. Mr. Boatwright Decided Mr. Wanstreet's Exit and Presented It as a Resignation.

Mr. Boatwright attests that Mr. Wanstreet "resigned from Chipotle in April 2023." Boatwright Decl. ¶ 8. Mr. Watkins testified that Ms. Huerta informed him the week before "that Matt was being fired and that I should expect a phone call from Scott and Matt on Monday"; that on the call Mr. Wanstreet said the replacement decision was "somebody else's" and Mr. Boatwright "said: It's mine"; and that the ensuing "transition" was "cover for him being able to look like he resigned." Watkins Dep. (Ex. C) 61:6–18, 81:20–82:4, 94:19–95:1. This corroborates the Wanstreet testimony and documents already before the Court showing that Mr. Boatwright personally reviewed the recordings, confronted Mr. Wanstreet, and negotiated his departure. Reply (ECF No. 118) at 12.

### E. The July 2023 Meeting.

Mr. Watkins confirmed that he, Mr. Boatwright, and Ms. Isas met in July 2023 because Ms. Isas wanted to raise concerns about her treatment, that Mr. Boatwright made "some comment about Matt" during the drive that Mr. Watkins "didn't think . . . was very savvy," and that when Ms. Isas said "at least he's not sexually harassing me," Mr. Boatwright "brushed that off." Watkins Dep. (Ex. C) 108:21–110:15. Mr. Watkins added that Ms. Isas "was complaining to a guy that wanted me to do it," *id.* 111:5–6, and that although executives spoke in "corporate speak nuance," Ms. Isas's account that Mr. Boatwright had authorized Mr. Watkins to fire her was "kind of my interpretation as well." *Id.* 113:4–17.

/ / /

**F. Nothing Was Put in Writing.**

Finally, Mr. Watkins testified that none of these communications with Mr. Boatwright exist in writing:

> **Watkins Dep. (Ex. C) 121:5–14:**
> A. No. There's no communication between Scott and me that you're going to be able to find in writing about this. Right? And no communication about hand wringing in writing anywhere. They're all verbal.
> Q. Is that for a reason?
> A. Yeah. You don't document stuff, you talk.
> . . .
> A. It's – it's – everybody understands how to do things appropriately, and – and not documenting things is a practice.

Written discovery cannot reach conversations that were deliberately kept out of writing. Only the participants can, and Mr. Watkins has now given his account. Mr. Boatwright's is the one that remains.

## II. THE TESTIMONY RESOLVES THE ISSUES CHIPOTLE RAISED

**A. Mr. Boatwright Has Unique, Firsthand Knowledge.**

The apex doctrine protects executives from depositions about matters of which they have no personal knowledge. Mot. at 15–16; Reply at 9–11. Mr. Watkins's testimony establishes that Mr. Boatwright personally (1) expressed distrust of Ms. Isas and directed that she be placed on a plan; (2) pressed for her PIP even after being shown that another director ranked below her, and offered to fly to Las Vegas to deliver it himself; (3) reserved to himself approval authority over any director's termination; (4) undertook to "take care of" Ms. Isas's return from leave, after which she was terminated instead of reinstated; and (5) decided Mr. Wanstreet's exit and how it would be characterized. These are the acts of a decision-maker, not a bystander, and they are the corrective action and the ratification that Plaintiff's claims and Chipotle's Nineteenth Defense put at issue. Reply at 5–7. Mr. Boatwright's state of mind in taking them is knowable only to him.

**B. Plaintiff Has Exhausted the Less Intrusive Discovery Chipotle Demanded.**

Chipotle argued that Plaintiff "must have at least deposed lower-level employees," and identified Mr. Watkins as the first of them. Opp'n at 12 (quoting *Padilla v. MGM Grand Hotel, LLC*, No. 2:22-cv-02109-RFB-EJY, 2025 WL 2772072, at *6 (D. Nev. Sept. 25, 2025)). Plaintiff

has now deposed Mr. Wanstreet and Mr. Watkins, the two Regional Vice Presidents who supervised Ms. Isas and reported to Mr. Boatwright, and has noticed the remaining subordinate witnesses and Chipotle's Rule 30(b)(6) designees. Reply at 10. Each deposition has pointed up the chain to Mr. Boatwright rather than away from him.

**C. <u>The Boatwright Declaration Cannot Substitute for Cross-Examination.</u>**

The declaration Chipotle offered in lieu of testimony now conflicts with the sworn accounts of Ms. Isas, Mr. Wanstreet, and Mr. Watkins on the same subjects: whether Mr. Boatwright made staffing decisions concerning Ms. Isas (¶¶ 18–19), whether he was involved in her termination (¶ 20), whether Mr. Wanstreet resigned (¶ 8), and whether his July 2023 remarks were directed at Ms. Isas (¶¶ 12–13). A declaration drafted by counsel cannot resolve those conflicts. Rule 30(a)(1) entitles Plaintiff to examine the witness.

## III. CONCLUSION

For the reasons stated in the Motion, the Reply, and this Supplement, Plaintiff respectfully requests that the Court grant the Motion and order Chipotle to produce Mr. Boatwright for deposition within fourteen days, or on such other schedule as will permit the deposition to be completed before the October 30, 2026 discovery cutoff.

DATED: September 15, 2026

**GREENBERG GROSS LLP**

By: */s/ Matthew T. Hale*
BRIAN L. WILLIAMS
*Pro Hac Vice*
JEMMA E. DUNN
Nevada Bar No. 16229
MATTHEW T. HALE
Nevada Bar No. 16880
PHILIP A. HORLACHER
Nevada Bar No. 16891
*Attorneys for Plaintiff April Isas*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically transmitted the foregoing **[PROPOSED] PLAINTIFF APRIL ISAS'S SUPPLEMENT TO MOTION TO COMPEL THE DEPOSITION OF SCOTT BOATWRIGHT (ECF NO. 111)** to the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, including the following:

Nicholas D. Crosby, Esq.
Jordan W. Montet, Esq.
MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
ncrosby@maclaw.com
jmontet@maclaw.com

Betsy Bulat, Esq. (admitted pro hac vice)
Robert J. Mollohan, Jr., Esq. (admitted pro hac vice)
Colyer F. Montgomery, Esq.
MARTENSON, HASBROUCK & SIMON LLP
2573 Apple Valley Road NE
Atlanta, Georgia 30319
bbulat@martensonlaw.com
rmollohan@martensonlaw.com
cmontgomery@martensonlaw.com
*Attorneys for Defendants*

Executed on September 15, 2026, at Las Vegas, Nevada.

*/s/ Matthew T. Hale*
An Employee of Greenberg Gross LLP

# EXHIBIT B

Declaration of Matthew T. Hale, Esq. in Support of Plaintiff April Isas's
Motion for Leave to File Supplemental Evidence in Support of
Motion to Compel the Deposition of Scott Boatwright

BRIAN L. WILLIAMS
*Pro Hac Vice*
JEMMA E. DUNN
Nevada Bar No. 16229
MATTHEW T. HALE
Nevada Bar No. 16880
PHILIP A. HORLACHER
Nevada Bar No. 16891
**GREENBERG GROSS LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 730
Las Vegas, Nevada 89135
Telephone: (702) 777-0888
Facsimile: (702) 777-0801
*BWilliams@GGTrialLaw.com*
*JDunn@GGTrialLaw.com*
*MHale@GGTrialLaw.com*
*PHorlacher@GGTrialLaw.com*

*Attorneys for Plaintiff April Isas*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| APRIL ISAS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CHIPOTLE SERVICES LLC, a California limited liability company; CHIPOTLE MEXICAN GRILL, INC., a California corporation,<br><br>Defendants. | Case No. 2:24-cv-02305-JAD-DJA<br><br>**DECLARATION OF MATTHEW T. HALE, ESQ. IN SUPPORT OF PLAINTIFF APRIL ISAS'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL EVIDENCE IN SUPPORT OF MOTION TO COMPEL THE DEPOSITION OF SCOTT BOATWRIGHT**<br><br>Hearing Date: September 29, 2026<br>Time: 10:00 a.m.<br>Courtroom: 3A<br>Magistrate Judge Daniel J. Albregts |

I, Matthew T. Hale, declare as follows:

1. I am an attorney duly licensed to practice law in the State of Nevada and before this Court, and I am an attorney with the law firm of Greenberg Gross LLP, counsel of record for Plaintiff April Isas in this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them. I make this declaration in support of Plaintiff's Motion for Leave to File Supplemental Evidence in Support of Motion to Compel the Deposition of Scott Boatwright (ECF No. 111) and Plaintiff's Motion for Order Shortening Time

on that Motion.

2. Plaintiff filed her Motion to Compel the Deposition of Scott Boatwright on August 10, 2026 (ECF No. 111). Defendants filed their Opposition on August 24, 2026 (ECF No. 117). Plaintiff filed her Reply on August 31, 2026 (ECF No. 118). The Motion is set for hearing on September 29, 2026 (ECF No. 114).

3. On September 2, 2026, I took the videotaped deposition of Mark Watkins in this action by videoconference. Mr. Watkins appeared remotely from Ladera Ranch, California. The deposition was reported by Susan E. Belingheri, CCR No. 655, Nevada Firm License No. 053F, through Veritext Legal Solutions, and was recorded by a videographer. Betsy Bulat, Esq., Colyer Montgomery, Esq., and Robert J. Mollohan, Jr., Esq., of Martenson, Hasbrouck & Simon LLP, and Michael Cruz, Esq., of Marquis Aurbach, appeared on behalf of Defendants, and Ms. Bulat defended the deposition. The deposition concluded at approximately 3:18 p.m.

4. On September 15, 2026, Veritext Legal Solutions delivered the certified transcript of the Watkins deposition, bearing the certificate of Susan E. Belingheri, CCR No. 655. Reading and signature were not requested before the completion of the deposition.

5. True and correct copies of the cover page, appearance page, reporter's certificate, and the pages of the certified transcript of the Watkins deposition that are cited in Plaintiff's proposed Supplement are attached hereto as **Exhibit C**.

6. A true and correct copy of Plaintiff's proposed Supplement to Motion to Compel the Deposition of Scott Boatwright is attached hereto as **Exhibit A**.

7. Mr. Watkins testified that he served as Chipotle's Regional Vice President for the Pacific South region from approximately April 2023, when he succeeded Matthew Wanstreet, through the end of Ms. Isas's employment, and that he reported directly to Scott Boatwright during that period. Watkins Dep. 37:1–3, 61:6–12. Mr. Boatwright's declaration likewise identifies Mr. Watkins as Ms. Isas's supervisor during that period. Boatwright Decl. (ECF No. 117-2) ¶ 5.

8. The Motion to Compel is set for hearing on September 29, 2026. Under LR 7-2(b), Defendants' response to Plaintiff's Motion for Leave would be due fourteen days after service, which is the date of the hearing. Defendants' counsel attended and defended the Watkins deposition

on September 2, 2026, and received the certified transcript from Veritext on the same date Plaintiff did. The Motion for Leave is filed on the date the certified transcript was delivered. A response deadline of September 22, 2026 would give Defendants seven days to respond and would permit the Court to have the complete record before the hearing.

9. Concurrently with the filing of the Motion for Order Shortening Time, I will advise the courtroom administrator for Magistrate Judge Daniel J. Albregts that Plaintiff has requested an order shortening time under LR IA 6-1(d).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15th day of September, 2026, in Las Vegas, Nevada.

*__/s/ Matthew T. Hale__*
Matthew T. Hale, Esq.

# EXHIBIT C

Excerpts from the Certified Transcript of the
Videotaped Deposition of Mark Watkins
September 2, 2026

Isas v. Chipotle Services LLC, et al.
Case No. 2:24-cv-02305-JAD-DJA

*Cover page (1), appearances (2), reporter's certificate (192), and transcript pages 36, 37, 38, 43, 46, 47, 48, 50, 52, 53, 54, 58, 61, 81, 82, 86, 92, 93, 94, 95, 97, 98, 100, 101, 108, 109, 110, 111, 113, 114, 115, 116, 117, 118, 119, 120, 121, 146, 147, 148, 187, 188*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
-oOo-

APRIL ISAS, an individual, : Case No.:
: 2:24 cv 02305 JAD DJA
Plaintiff, :
:
vs. :
:
CHIPOTLE SERVICES LLC, a :
California limited liability :
company; CHIPOTLE MEXICAN :
GRILL INC., a California :
corporation, :
:
Defendants. :
====================================================

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
MARK WATKINS
WEDNESDAY, SEPTEMBER 2, 2026
WITNESS APPEARING REMOTELY FROM
LADERA RANCH, CALIFORNIA

REPORTED BY: SUSAN E. BELINGHERI, CCR #655
NV Firm Lic. #053F

APPEARANCES:
(all appearances via videoconference)

For the Plaintiff:

GREENBERG GROSS LLP
Attorneys at Law
By: MATTHEW T. HALE, ESQ.
1980 Festival Plaza Drive, Suite 730
Las Vegas, Nevada 89135

For the Defendant:
MARTENSON, HASBROUCK & SIMON LLP
Attorneys at Law
By: BETSY BULAT, ESQ.
By: COLYER MONTGOMERY, ESQ.
By: ROBERT J. MOLLOHAN, JR., ESQ.
2573 Apple Valley Road NE
Atlanta, Georgia 30319
-and-
MARQUIS AURBACH
Attorneys at Law
By: MICHAEL CRUZ, ESQ.
10001 Park Run Drive
Las Vegas, Nevada 89145

The Videographer:
VERITEXT LEGAL SOLUTIONS
By: BRYAN PAULSON
611 Anton Blvd., 5th Floor
Costa Mesa, CA 92626

Ileana Huerta one to two times a week, during April's leave, about April. I had originally asked about the decision to terminate her and the conversations about her termination. Were those one to two conversations a week related to her potential termination, or no? 10:48

A. That conversation was embedded in every conversation. It was like: Is she coming back? Will Chipotle let her back? Does she want to come back? How are we going to handle it? What I'm going to do about John Lopez. 10:48

So, yes, every week that conversation was happening, because we were trying to understand what was going to happen.

Q. And when you say will Chipotle let her back, what does -- what does that mean to you? Who's Chipotle in that sentence? 10:48

A. Well, so there's nothing that ever was done around anybody's PIP, especially directors and above, that HR, legal, and operations were not all three tied at the hip and had a consensus. So there had to be a conversation and approval. There wasn't a single email, document, communication I had that wasn't signed off by HR and legal. 10:49

Q. And you also mentioned operations. Who are you referring to in operations? 10:49

A. Me and my boss, Scott Boatwright. Later Michael Thoms. But the April stuff was pretty much concluded by the time Mike Thoms took over.

Q. Did you have any conversations with Michael Thoms about April's termination? 10:49

A. So during the LOA period for April, I would be constantly asked about April. Because a lot of those people that thought Matt were dicks were also friends with him. And so I was super confidential to Michael Thoms about it, but he would constantly pressure and 10:50 push me to give him information on it. But I knew he was good friends with Matt. And so he would ask about it, I wouldn't speak about it.

Scott was a little more loose-lipped about it. At some RVP meetings he would talk about it opaquely, 10:50 but I would be questioned about it. And -- and then in December, just before -- she got terminated in January, I think -- Scott promoted Michael Thoms and read him in on the April situation at the Christmas party. And then he came over to me and he goes: Oh, my God. I didn't 10:50 know. And then I had to explain to him why I wasn't explaining things to him, he's my new boss.

Q. Thoms was your new boss?

A. Yes.

Q. Okay. 10:50

So you mentioned Scott Boatwright was a little loose-lipped about it. Explain what you mean by that.
A. He would just -- I can't remember an exact comment, but I'm sitting there getting pounded publicly and privately to talk about Matt and April, and I just wouldn't do it. And then he would slide and make a comment about April or Matt in front of the RVPs. And I'm going: I can't believe he's talking and bringing the subject up. Right? Shut up, was my attitude. 10:51
And then later on I would be in a car, and I would get pounded again, and the vice president of the east coast, Dan Rueda, looked at me and goes: You did a very good job deflecting Michael Thoms on that. You're being very professional. Good job. 10:51
And so -- so -- but that, those are the scenarios I can recall. 10:51
Q. What was the comment in that particular instance from Michael Thoms that you deflected?
A. Tell me -- he basically was asking me what's going on with April, why is she gone, what about Matt. It was -- it was all around the -- the rumors about the situation. 10:52
Q. And so how did your colleague witness that conversation? Was it had in front of that --
A. Well, we were in a car with four people, and 10:52

A. She literally -- the math, in a 90-day PIP, and then she had 76 days left on it when she left. And so -- so she had no opportunity to fix herself with the PIP. In fact, I was directed by HR and legal that when she returned from her LOA, the PIP begins at day 76, 10:57 that she gets the full 90 days to complete her PIP.

Q. Okay. So let's go back. We were talking about conversation about April's termination with various individuals, including Ileana and Mr. Boatwright.

I want to talk about your conversations with Mr. 10:58 Boatwright. Do you recall any of those conversations?

A. Yes.

Q. Could you tell me about the first that you recall?

A. Well, there was a number of conversations, from 10:58 the time I got promoted, about April and -- and the Las Vegas market and its performance, and there was a number of conversations during the PIP process and LOA process. Most of the time it was him asking me what's going on, tell me what's going on. 10:58

Q. Going on with what?

A. April's LOA, April's -- April being gone, what's going on in the market, what's going on with April.

Q. And how would you know what's going on with April? 10:58

BY MR. HALE:

Q. I want to hear all about those conversations, so let's go through them. What's the first one you recall?

A. So the gist was April brought her note back to return to work -- well, actually, she didn't have a note yet. She actually informed me that: I'm ready to return to work. 11:01

And I asked Ileana: What am I supposed to do?

And she says: You need to get a doctor's note from her. Which is standard practice at Chipotle, you can't come back from LOA without a doctor's note. 11:01

And so it took three or four days and a doctor note was turned in. And then at that point it was one of those conversations where Scott asked me what's going on. 11:01

I go: April brought a note. She's coming back.

And at that point Scott wanted to know what we're going to do in Vegas with her back.

And I said: Well, John's doing a really good job, but they're going to, they're going to -- this is a standard practice of Chipotle, that you can't -- if a guy's on LOA, you can't replace them. You can't add to head count and then figure it out later, which I wanted to do. 11:02

And so Scott said: I'm going to take care of it. 11:02

And he had, to my understanding from Ileana, he had a conversation with Roger Theodoredis, the chief legal officer, who had a conversation with Ashley Coleman, who is the director of legal and a lawyer, and that conversation was to terminate April. And then -- and I 11:02 heard that through multiple sources, including privately with Ileana Huerta.

And so then from the time the doctor note returned until January when we returned, we were in this limbo for three to four months of not knowing what was 11:03 going to happen, as Chipotle was negotiating April's exodus with April.

Q. So let's go back. Thank you.

Scott said he was going to take care of it. Did he say that, those words to you? 11:03

A. Yes.

Q. And you took that -- you understood later that was -- he was going to take care of it by terminating April.

A. I didn't understand that he would be terminating 11:03 April. I -- I had the understanding that he would engage with folks at Chipotle about the subject. He had that authority and influence in the office. I was out in the field.

Q. And so you understood the decision was to 11:03

terminate April; correct?
A. Yes.
Q. While she was on leave.
A. Yes.
Q. Did you disagree with that decision? 11:04
A. I was very surprised by that.
Q. Why do you say that?
A. Because in 40 years of working, I've never seen anybody go out on LOA, get a doctor's note, ready to return, and get terminated. Even when I wanted to 11:04 terminate the people in every job I've ever had, including Chipotle, it was very clearly set out to me, you have to take them back. It was the first I've ever seen it.
Q. Did anyone say, at Chipotle, that you would have 11:04 to take them back, other than you?
A. Take April back or anybody back?
Q. April back. Like, that that was the standard protocol.
A. Oh, I was under the clear impression that when 11:04 April's LOA was up, she's coming back and I have to manage that. That's why they wouldn't let me promote John Lopez, the director, because April's coming back. You have to keep the decks clear in case April comes back. 11:05

also, told you that you need to be ready?
A. No.
Q. Do you have any sense of the timing in which April was terminated?
A. Yeah. So by December I was told it's getting very close and likely it will -- in fact, on vacation during the Christmas holidays I was told to be ready to go to Workday and it was going to happen before January 1st. And then all of a sudden it's the middle of January and it still hadn't happened yet. And so I'm just going along, and then one day I get a phone call and say go to Workday and press this button. 11:06 11:06
Q. Who was that phone call from?
A. It was from legal.
Q. Ashley, right? Okay. 11:07
Is that right, Ashley Coleman?
A. Yes.
Q. And so just a minute ago you told me that, you know, you were being told in December, you know, you should be ready to push the button. Was that from Ileana? 11:07
A. Yes.
Q. Anyone else?
A. And Ashley.
Q. So I'll represent to you that April's 11:07

MR. HALE: Okay. Let's take a -- I don't want to take too long of a break, but maybe seven minutes. Come back at 11:15.

THE WITNESS: Sounds good.

MR. HALE: Off the record. 11:09

THE VIDEOGRAPHER: This is the end --

MS. BULAT: Sounds good.

THE VIDEOGRAPHER: -- of media unit one. It is 11:09 a.m., and we are off the record.

(A short break was taken at this time.) 11:16

THE VIDEOGRAPHER: It is 11:16 a.m. and we are back on the record.

BY MR. HALE:

Q. All right. Mr. Watkins, did you have any conversations with counsel during the break? 11:16

A. No.

Q. All right. So let's finish up some of the things we were chatting about.

The conversations with Scott Boatwright, one of which you said he was going to take care of it. Any 11:16 other conversations you had with Scott that you can remember relating to April's potential termination?

A. Prior to that it was regarding her PIP and her performance, and post that it was more like where are we with it, where are we with it. He'd ask me questions 11:17

until the day I said they had me hit -- terminate in Workday today.

Q. Tell me about that conversation. You -- you had a conversation with Scott Boatwright about having been told to terminate April? 11:17

A. Yeah. So it was my understanding that Chipotle was negotiating an exit with April for all those months, from the time she had her doctor's note to return. It was my understanding that they were in a negotiation with her. 11:17

And -- and so when -- when that got to a certain point I expected -- since I was her direct supervisor, I was the only one in the computer system that could hit the button in Workday that would terminate her. And so -- I can't remember what direction they gave me for 11:18 the reason. There was a reason. I couldn't tell you. It is probably in the HRS system, still today there. And I plugged that reason in and hit go.

And then I let Scott know: Hey, it's over. It's done. They had me terminate her. Can I promote John 11:18 Lopez.

Q. Uh-huh. Okay.

So did Mr. Boatwright have any comments or thoughts about the termination that he communicated to you? 11:18

A. Not that I can recall.
Q. Did you understand that he was already in the know about the decision to terminate her?
MS. BULAT: Objection, may call for speculation. 11:18
THE WITNESS: So I wasn't sure.
BY MR. HALE:
Q. He didn't say anything to you that would indicate that?
A. No. 11:18
Q. Do you believe, based on your knowledge of operations, that he would have been knowledgeable about that decision?
A. The executive team regularly had cross-functional conversations and alignment. I wasn't in the room when 11:18 they had them. Scott, when he's communicating to me, typically was in a collect information mode not a give information mode, and so he wouldn't share something like that with me. That's kind of where that was.
Q. Got it. 11:19
So even if he knew, he wouldn't tell you.
MS. BULAT: Objection, may call for speculation.
THE WITNESS: I -- I know that most of my conversations regarding April was him asking me 11:19

the language about I'm avoiding the PIPs for at least 90 days, and version B with no PIP language -- for directors -- in it, and then I shared that with all the directors. Actually, I shared it with all seven directors and their 50-plus reports, the field leaders, as our vision for my taking over for 30, 60, 90 days. 11:23

Q. So what was -- your conversation with Scott about that document, in his office; correct?

A. Yes.

Q. What was the content of that conversation? 11:24

A. He let me know his leadership style, that he would give me carte blanche to run my business unit, that I had discretion to promote or terminate anybody, except for directors. The only thing he asked for is that I don't promote or terminate a director without his involvement. 11:24

Q. Was April a director?

A. Yes.

Q. Did he mention April at all during that conversation? 11:24

A. Yes.

Q. How -- how did she come up?

A. She came up around her performance in the Las Vegas market.

Q. What was said by Scott regarding that topic? 11:25

about it.
Q. Was Scott playing it -- sorry. Go ahead.
A. No, go ahead.
Q. Was Scott being equally political and playing down the middle, or -- 11:27
A. So Scott did not share with me that Matt was terminated. When I got promoted, it was from a phone call from Matt and Scott. And that phone call was Matt saying I am resigning, I'm recommending that you get promoted to replace me, but it's not my decision. Scott 11:28 was on the phone and said it's my decision, and offered me the job.
Q. And how did you come to the understanding that Matt was -- did not resign but was in fact terminated?
A. Because before that phone call, the prior week, I 11:28 was informed by Ileana Huerta that Matt was being fired and that I should expect a phone call from Scott and Matt on Monday.
Q. Tell me everything you remember about that conversation with Ileana. 11:28
A. So Matt was constantly in trouble. He would -- he would behave badly and get in trouble. Sometimes that trouble would get him a delayed or no promotion. Sometimes it was -- he was at risk for getting terminated, especially during the investigation. 11:29

She goes: Nope. He lost his chance. I gave him a chance.

And so then my understanding is that's when she turned the tapes in to Chipotle. And then I got that information from Ileana that tapes were turned in. 11:54

And then Chipotle was not happy because the -- as we went along the process, it was clear those tapes were made before her original complaint and she failed to communicate that in the original complaint.

Q. Did Ileana ever indicate to you about the existence of any recordings before then? 11:54

A. No.

Q. Earlier you were talking about the conversation, the Monday conversation where you had to feign surprise about your promotion, that Wanstreet said that he picked you to take his place. 11:55

A. Yes.

Q. And then Scott set the record straight and said it's my decision?

A. No. The other way around. 11:55

Matt said: I'm leaving. I'm resigning. I'm recommending that you get promoted. It's not my decision, it's somebody else's.

And Scott said: It's mine. And offered me the job. 11:55

Q. Got it. Thank you for that.
A. By the way, Matt would not have chosen me to promote -- replace him after he was terminated. It was Scott's decision, not Matt's.
Q. Why do you believe that? 11:56
A. Because Matt didn't like me. He was a dick.
Q. Okay.
Earlier you were talking about RVP meetings, drinks, fire. Was it -- it's my understanding that there's kind of a bourbon, golf culture among some 11:56 people in the directorship. Could you tell me more about that?
A. Chipotle, at the RVP level, has traditionally been an old-school, ole boys' network. In fact, it was statistically -- we had these stats about the percentage 11:56 of female and male employees at every level, and Chipotle was always skewed inappropriately male. When I took over the LA market as a director, it was skewed, and I ended up -- it was skewed mathematically on gender and gender comp. So I spent three years fixing my 11:57 market to get it 50/50 on gender distribution of leaders and gender equity in compensation.
So -- and we got stats from HR all the time about that. Because most of the HR leaders were females, by the way, so they were very aware of it. And we had a -- 11:57

were always happening.

My answers were: I'm not talking about it.

Q. That reminds me. So you had mentioned earlier that Boatwright had reached out to you on occasion to ask you about -- about a lot of information, basically. 12:01 He was -- he was more interested in getting information than giving it to you. He was asking about -- well, I'm sorry. When she was on her leave, what was he asking you?

A. What's going on with -- he would ask about April 12:02 and Ashley. They were both on leave at the same time. What's going on with April and Ashley? What's going on? What do you know?

Q. So I think I understand what you're saying, but what I'm confused is how would you be in a position to 12:02 know anything if she's on leave? She's not working.

A. Well, he knew that I was in regular communication with legal and HR about it. I think, my personal supposition, is he knew what was going on. He was seeing what I knew was going on. Because that's how you 12:02 collect information. That's how I got everything from April, Matt, and HR. He was correlating his own information. That's how --

Q. Sorry. Go ahead.

A. When he was asking me questions, I looked at him 12:02

A. We didn't have a conversation about that.
Q. Okay.
And then any other conversations that you had with Scott during the PIP wherein Scott was asking you for information? 12:09
A. During the entire PIP process? What are you asking? I'm not clear.
Q. Yeah. I guess, you know, he was -- he was seeking information from you all the time. So you had mentioned that certain topics he was seeking on were 12:09 what's going on with April, I guess. And you had said, well, she's on leave, and you think that John should be promoted, he's doing the job. Was there any other --
A. It was --
Q. -- discussion had? 12:09
A. It was mostly that. It was mostly a continued conversation of no news. Right? I'd also share with him that I thought April was engaging with the other directors, and the directors engaging with them, and that I felt it was disruptive, and I shared that with 12:10 him.
But -- and then -- and there was, really, a cycle of what's going on and we're just in this waiting mode up to the point she brought her doctor's note back.
Q. How many times did you communicate to Scott that 12:10

you thought she was communicating with the team while she was on leave?

A. Probably three to five times over those months.

Q. And how did Scott react?

A. He goes: That's not good. 12:10

Q. Did he say anything else?

A. Not that I can recall specifically.

Well, so here's what happened. We specifically talked about Bryan Duff, and Bryan Duff was in development to get promoted to the RVP level. He was on 12:10 the bench for development. And it made Scott very nervous about him. In fact, Bryan Duff went to a meeting at the office and did very poorly in a presentation. And it -- and Scott goes: Pretty much between his ability not to speak in front of people and 12:11 the risk he has with -- with being inappropriate speaking to April, that we're not going to worry about him much more. And so I didn't focus on his development as much.

Q. Scott communicated that to you? 12:11

A. Scott communicated to me how poorly he did, and -- and we had a discussion about the combination of he -- he came into a presentation for his development unprepared and spoke poorly, and he was speaking to April. He became a high risk development candidate. We 12:11

moved on to somebody else to keep working on.
Q. Did you ever consider Matt Wanstreet to be a friend?
A. No.
Q. I'm trying to keep track of all the threads. 12:12
When you had that conversation on that Monday, with Matt and Scott, did you have another conversation after that with Matt about the handoff to take over?
A. So I was informed on the phone call that Matt was leaving in 30 days, that he's going to have a transition 12:12 with me; however, he'll be staying at home and not working in the field during that 30 days, and you can talk to him there about anything at any time.
So I -- I actually had probably two to three conversations with Matt during that transition period. 12:12 Mostly bullshit to be politically correct. Zero -- zero value.
Q. Okay. Bullshit from his side, or both?
A. Both. Because at the end of the day they tried to pretend to me that he resigned and he -- he was going 12:13 to do a transition with me, but he was going to work from home. I clearly knew why he was working from home. He wasn't allowed to leave the building and go back in the field because he was terminated. And so I knew that I was asked to go speak to him about transition stuff as 12:13

cover for him being able to look like he resigned. So I knew the conversations were a waste of everybody's time, but I did them anyway.

Q. Was April discussed at all during those conversations? 12:13

A. Maybe, but at that point Matt wasn't really complaining about April to me. Before that he was complaining about her up to the moment he lost his job. But after that, I think he was done.

Q. Did Matt ever make any positive comments about 12:14 April's abilities or performance, to you?

A. Matt would constantly talk about April's abilities and performance. Eighty percent of the time how she was the most amazing, highest performing team director in the company, and twenty percent how she was 12:14 crazy and a bad performer. Manic.

Q. You had conversation -- did you have any conversations with Matt Wanstreet about the potential PIPs?

A. Oh, yeah. 12:14

Q. Was there ever any indication from anyone -- Ileana, Matt -- that -- I'm sorry. I'm losing her name. The two people -- it was April and --

A. Ashley Coleman, San Jose. April Isas, Las Vegas.

Q. Ashley Coleman. 12:15

Q. Why do you say that?
A. Because I decided that. I pushed that narrative.
Q. Tell me why.
A. When I took over, Scott told me that he doesn't trust April and doesn't want her on his team, and that I should put her on a plan. I told her I was aware that she was supposed to be on a plan by Matt, and Matt never did it. I told Scott it was a bad idea to put April on a plan. 12:16
Q. Okay. 12:16
I have a question. So he said he doesn't trust April. Did he explain why?
A. No, but my supposition was the recordings.
Q. Did he say anything about why he didn't trust April? 12:16
A. Not specifically, no.
Q. You recall him saying the words he doesn't -- that I don't trust April?
A. I don't trust April and I don't want her on my team. That was the quote from him. 12:16
Q. What was the circumstances of -- context of this conversation? Was it in his office? Over the phone?
A. This was part of my discussion of transitioning into the role.
Q. Where was this conversation had? 12:17

A. It was either in his office or on the phone
calls, and I don't recall which.
Q. So you told Scott, in so many words, that you --
you disagreed. How did he react to that?
A. So here's my position. I knew about all the 12:17
April/Matt stuff, but Scott didn't know I knew, so I was playing it down the middle with Scott. And so when I said to Scott I think you have a problem because Ashley Gibbs is a statistically worse performer than April, and to put the second worst person on a PIP and not the 12:18
first person on a PIP is problematic.
Now, I also said that because I knew April had her complaints against Matt and I didn't want -- I was aware that we're putting ourselves at a retaliation risk by PIPing her. 12:18
So my -- my guidance to Scott was around: You have a problem because she's not the worst performer.
His answer to me was: I'll leave it to you.
And then I went: Oh, shit. What does that mean?
Q. Did you inform anyone else, other than your 12:18
counsel, of this conversation?
A. Oh, yes.
Q. Who?
A. So Ileana within five minutes of the
conversation. And I go: Oh, shit. What does he want? 12:18

anybody on a PIP. It's going to make it hard for me. It's going to freak these guys out. I don't want -- I don't want Matt's leftovers on my -- because I was -- for months it was going to be -- April spoke to me for months before Matt left. 12:20

I've been informed you're going to PIP me and fire me. I've been informed you're going to PIP me and fire me.

And I'm going, like: I don't want to do that. That's Matt giving you the information so you'll fear me 12:20 becoming your boss so you won't complain about him. He's manipulating you.

Right? So when I did put her on a PIP, she felt I failed to follow my agreement with her and she got mad at me, is my opinion. Right? So PIP drama with this 12:20 woman.

I went to -- I went to Dan Rueda, said: What does Scott really mean by this? What should I do?

And Dan Rueda is very politically correct. He goes: Well, of course you should look at it this way 12:21 and that way.

So what I did is I developed a scorecard of ranking all 50-plus directors to know where I'm at. Because just because Ashley and April were at the bottom of my seven doesn't mean that they're in the bottom of 12:21

the company. I've had plenty of -- I've run a good business unit in my career. A lot of my worst performers are middle of the road in most companies. Right?

So I go: I don't have any perspective on April 12:21 and Ashley. They may be average performers. Just because they're the worst in the region doesn't mean they are.

So I built this scorecard and I showed it to Dan. Dan goes: Oh, by the way, I'm doing the same thing. I 12:21 built a scorecard, too. We matched them. We correlated. We had the same results.

On that result, the very last person on the bottom was Ashley Coleman in San Jose.

Q. Gibbs. 12:21

A. Gibbs. Sorry.

Ashley Gibbs in San Jose. April was in the bottom decile. Definitely the bottom, but probably six or seven from the bottom out of 50-plus. In between April and Ashley there's a number of other directors as 12:22 well. Right?

And so I used this now to go back to Scott and say: I can't put -- the math of it, it's super inappropriate to put April on a PIP and Ashley is truly the last director in the company. 12:22

keep going. I'd rather get it over with, but I can also take a lunch break, too. I don't care.

MR. HALE: Susan's working real hard, too. What do you think, Susan?

THE COURT REPORTER: Either -- a short break either now or in half an hour. It doesn't matter. 12:31

MR. HALE: Okay. Let's take a break now. We'll come back at 1:00. Does that work for everybody?

THE WITNESS: That works.

MR. HALE: All right. 12:31

THE VIDEOGRAPHER: All right. This is the end of media unit two. We are off the record at 12:31 p.m.

(A short break was taken at this time.)

THE VIDEOGRAPHER: It is 1:01 p.m., and we are back on the record. 01:01

BY MR. HALE:

Q. Okay. Mr. Watkins, during the break did you speak with your attorneys at all?

A. No. 01:01

Q. I want to ask you about a -- an outing that you may have been party to. Did you ever go on a car ride or a coffee shop meeting with Scott Boatwright and April Isas?

A. I think you're referring to a time where April 01:02

wanted to have a conversation with Scott about me, and the three of us went to a restaurant, a coffee house, and had a conversation.

Q. Okay.

So you recall that occurring? 01:02

A. Yes.

Q. All right.

Do you recall Scott ever saying that we should go pick up Matt during that conversation?

A. No, but he may have opaquely made a comment about Matt during the drive. 01:02

Q. Did he mention that -- like, point out a Range Rover at any point in that drive?

A. I don't recall.

Q. Do you recall whether he said anything opaquely about Matt? 01:02

A. I think he -- I do recall some comment about Matt. I didn't think it was very savvy. April probably answered it opaquely herself, and we moved on.

Q. So you have a specific recollection of that? 01:03

A. I have a general recollection of that occurring.

Q. During that conversation did Boatwright, Scott Boatwright, ever say -- comment on April's performance?

A. So it was, again, listening mode. She wanted to speak. She -- she wanted to speak to him about how she 01:03

was not satisfied with me managing her, and he made sure I was there in the room when we did that.

Q. Is that what she communicated?

A. Well, that's what we -- that conversation was had, was the three of us at the coffee shop. 01:04

Q. And what did April say?

A. The general gist was that I don't like the way Mark is managing me, but at least he's not sexually harassing me. I remember that quote.

Q. She said something like that? 01:04

A. Oh, exactly that.

Q. Okay.

And how did Scott react to that?

A. I think that he brushed that off, but I thought that was amazing. 01:04

Q. Did you ever -- well, let me continue on that line.

Did April have any other criticism regarding your management during that conversation?

A. I don't remember the specifics, but generally 01:04 Matt was pretty laissez-faire or in your face, one of the two. And a lot of times he was laissez-faire eighty percent of the time, and then got in your face when things were bad, and then laissez-faire again. He was double laissez-faire with her because he had to avoid 01:05

dealing with her because of all the bullshit.
So she was definitely not used to having a leader that was present. Right? And I was managing her for the first time as her new boss, officially. So she didn't like it. What she didn't understand was she was complaining to a guy that wanted me to do it. 01:05

Q. Do you recall Scott Boatwright had conversation, ever, indicating that he had given you authority to terminate her if you wanted?

A. He -- he didn't say that to her in front of me. 01:05

Q. Okay. You don't remember that?

A. No.

Q. Did you ever call Matt Wanstreet a liar in that conversation?

A. Repeat the question, please. 01:05

Q. Did you ever call Matt Wanstreet a liar in that conversation?

A. I don't recall, but I probably have said that more than once in my life.

Q. Let me just give you the -- the quote from Ms. Isas's deposition regarding this conversation. 01:06
Quoting Scott Boatwright:
Look, I told Mark if he wants to fire you, fire you. I don't care.
Do you recall anything like that? 01:06

investigation regarding Matt, or the recordings regarding Matt, were brought up in that conversation whatsoever?

A. So nobody spoke about any of this directly, ever. Everybody was opaque about it. Scott, if he did anything around Mark can let you go, he would not have said it as roughly as she described. Everything was politically correct, corporate speak nuance. 01:08

And so, no, we didn't have any -- these quotes are, like -- are, like -- don't feel right to me because we all spoke in this nuance language. 01:08

Now, if somebody said that was my interpretation of what happened, I -- understand that, because that's kind of my interpretation as well. Everything was said, but what you're -- what you're quoting me is somebody's internal interpretation, I believe. It's kind of mine, too, by the way. But nobody spoke that way. We're all opaque and corporate speak. 01:08

Q. You're saying your interpretation -- it was also your interpretation that she was put on a PIP because of her complaint? 01:09

A. Well --

MS. BULAT: Objection, misstates.

THE WITNESS: -- that -- go ahead, Betsy.

MS. BULAT: Objection, misstates. 01:09

You can answer.

THE WITNESS: Yeah. So I want to say it misstates, too. Right?

And so, like I said, a lot of answers both parties here are going to like what I say and a lot of answers both parties are not going to like what I say. Alls I'm doing is telling you the facts and the truth. Right? 01:09

So I -- I have no facts that tell me that I -- that she was on a PIP because of that. 01:09

BY MR. HALE:

Q. Because of the complaint?

A. Yeah. I -- nobody told me: Complaint, A. PIP, B. Nobody did that to me.

Q. But that's what you believe? 01:09

A. I don't know if I believe that either. I believe what drove the concern about April was less about the Matt complaint -- because we all complained about Matt. I really believed the recording made everybody uncomfortable and not trust her. 01:09

I know that, because I sat down with her and I told her: Don't record me. And my uncomfortable with April was mostly driven by that. It's unfortunate for her, because it -- because she needed to protect herself, and she did it the way she thought was best. 01:10

She did it in a way that got what she needed with Matt not to be her boss, but she did it in a way that pretty much killed her credibility and trust with everybody in the organization.

So -- so that's -- I think -- I think the trust that was broken from the recording made everybody uncomfortable with April, way more than she made a complaint about Matt. 01:10

Q. Got it.

So you think her recordings had to do with her PIP? 01:10

MS. BULAT: Objection, misstates.

THE WITNESS: I don't know if the recording drove the PIP. Again, nobody told me to put her on a PIP. It was all implied. Right? It was all politics. Right? So I could guess a million things, but nobody wants me to guess here. Right? I could tell you what I know. I can't tell you what I guess. 01:10

BY MR. HALE:

Q. So let me just revisit. You had a conversation with Wanstreet, we were talking about, and you had -- he had said -- not Wanstreet. Sorry. Boatwright. And he said he didn't trust April. You quoted that to me. Do you remember that? 01:11

A. Well, he said: I don't trust her. I don't want 01:11

her on my team.

Q. Right.

And you told Scott it was a bad idea to put her on a PIP.

A. Yes.

Q. Okay.

So -- but why do you believe -- I asked you then why you didn't believe that Scott trusted April, and I believe you told me that it was because of the recordings.

A. Yes.

Q. So, you know, like we talked about before, A to B to C, don't you believe that Scott suggested to put her on a PIP because of the recordings?

A. So you're asking me to guess what's inside Scott's head. I don't know what's in Scott's head.

I was more concerned about I have a new boss with expectations, and I didn't know what he really meant. That's why I sought out other people's counsel, what does Scott -- when I pushed back against Scott, his answer to me was: I'll leave it up to you.

So that was him deflecting it. He was being politically savvy himself. And so he put it on me. But I didn't know what the hell he meant by that, so I spent the next X amount of time trying to figure out what he



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

really meant.

Q. And what -- what did you come to believe?

A. So when I really showed him the math that April's performance was bad, but Ashley's was worse, Ashley Gibbs, when Ashley's performance was worse, it would not be savvy to put her on a PIP and skip over Ashley. The next thing I got was a call from his assistant scheduling me to be in the market with him in San Jose to visit Ashley's market. 01:12

Q. You and Scott and Ashley? 01:12

A. Yes. San Jose.

Q. Did you go to the market with -- with him?

A. Yes.

Q. And what happened then?

A. It was a very, very bad visit. 01:13

Q. What do you mean by that?

A. The restaurants were dirty, they were not running well, they were not prepared for getting your COO visit. It was embarrassingly bad.

Q. And what were Scott's comments? 01:13

A. On the plane with me -- we were the only two on the plane on the way back. Corporate jet. He looked me in the eye and said: I get it, you just took her over, but if I was her boss I would fire her today on the spot. 01:13

Q. Did he tell you he wanted you to put her on a PIP or fire her?

A. So I told him: Scott, we're not going to fire her on the spot. That wouldn't be savvy. We probably should PIP her before we do that. 01:14

And then I said -- then I told him, I go: I'm not really sure what to do here. You want me to put April on a PIP, but Ashley needs to go first. Ashley -- I go: If I put Ashley on a PIP it's going to be 90 days of this, and April's going to be 90 days out. And I go: 01:14 If we do April first it's not savvy. I could do both of them at the same time, and that would be a logistic nightmare. It's all crazy.

At that point he said: You should put -- you should put Ashley on a PIP, and if you want me to fly to 01:14 Las Vegas with you to put April on a PIP, I'll go with you.

Q. Why would he want to come to -- why did you take him to be offering that?

A. He didn't want to go to -- to Vegas to put her on 01:14 a PIP. And I immediately said: I'm not bringing you to put anybody on a PIP. My job is to protect you, not put you -- expose you.

And -- and so that's when I came back and went: Oh, shit. What am I going to do? 01:15

And then Ileana and I put our head together, and I said -- I went and told Scott's assistant how bad it was in San Jose. He goes: That's what he does. He sees something bad, he's going to put your face in it. And I get it. 01:15

So I kind of felt like I can't put April on a PIP, because Ashley's on a PIP. The next moment I'm on an airplane and seeing how bad San Jose is. So it kind of was putting me in a position, I've got to put Ashley on a PIP. And then -- then A plus B, after Ashley it's April. 01:15

Once -- once Ashley's on a PIP, then I go: Do I do Ashley then April, or do I do both at the same time? And that was the drama.

I didn't want to do either one of them. I was really in a tough position. And I knew it would be disruptive. And I told it to Scott, too. And we ended up making the decision to do it together. And it was my call at the end. I made it, and Scott liked it. 01:15

Q. And what was your call? 01:16

A. I said: We're going to put -- I said I'm going to put them on PIPs on the same day. Because I did that because, honestly, their statistics made it acceptable to put them on PIPs. Now, the four or five leaders in between them that were -- didn't work for me, they 01:16

weren't on PIPs and they weren't going to be on PIPs. But that's not my business unit. Right?

So there's -- one could argue statistically, based on the math, they both could be on PIPs. My argument never was April never deserved to be on a PIP. It was stupid to have a sexual harassment complainer go on a PIP if she's not the worst person. It's just stupid. Don't do it. 01:16

But once Ashley's on a PIP, then I go: There's no reason not to put April on a PIP. From a math standpoint. Neither one of them should have, for me, for my career. And I knew it at the time, but I still had to do it. I was between a rock and a hard place. 01:17

So we put them on PIPs the same day.

Q. And did Ileana agree with your perspective? 01:17

A. So she was with me every step of the way, wringing her hands with me. And then we made -- we kind of put our heads together and we literally flew to -- to Las Vegas, PIPed April in the morning, and four hours later PIPed Ashley in the afternoon, to get it done the same day. 01:17

Q. Are there any emails about all this?

A. Yeah, the PIPs. We wrote the PIPs and we got them -- they went through HR and legal, the washing machine, and back and forth until they were written 01:17

appropriately and got approved.

Q. But, I mean, was there any discussion in writing between you and Ileana and any of the hand wringing about what to do?

A. No. There's no communication between Scott and me that you're going to be able to find in writing about this. Right? And no communication about hand wringing in writing anywhere. They're all verbal. 01:18

Q. Is that for a reason?

A. Yeah. You don't document stuff, you talk. 01:18

Q. Got it.

A. It's -- it's -- everybody understands how to do things appropriately, and -- and not documenting things is a practice.

Q. Let's go back to -- I want to talk about that at-model metric. A strange thing to say. 01:18

So you mentioned, of course, obviously everyone wanted to be at a hundred percent; right? But that's a perfect world. Was anyone ever at a hundred percent?

A. It's measured daily, so there's plenty of days where you had two or three or four days in a row of a hundred percent. But at the end of the month, when you look at the scorecards -- you probably have some scorecards -- when it's measured -- when it's measured monthly and quarterly, nobody's at a hundred percent. 01:19 01:19

when she was going to come back?

A. Yes. The date all was contingent on we've got to get the doctor's note. So she said I'm ready to come back now. And -- and then -- and then -- then Ileana goes: We don't have the -- we don't have the doctor's note. 01:55

So the drama was multiple days of waiting for the doctor note to appear. But it was clear, she has a note. Once that note lands, she's coming back.

Q. Do you know when the note landed? 01:56

A. No, I don't remember the exact time, but within days.

Q. That same month?

A. Yeah.

Q. October? 01:56

A. Probably.

Q. And obviously she didn't return. We had a conversation earlier about how, you know, you were kind of in limbo and you were just told to get ready to press the button. Do you recall that? 01:56

A. So that was later. Right? That's the stuff late December.

So what happened when this happened, when the note came back, I let Scott know that April's coming back. And at that point that's when the conversation I 01:56



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

had with Scott, where he said I'm going to take care of
this, and he had the theoretical discussion with Roger
Theodoredis. And my understanding is Roger Theodoredis
overruled Ashley Coleman and said she's not coming back.
And then so -- then the conversation shifted from 01:57
accepting her back from LOA to negotiating her exit.

Q. Is this understanding gained from Ileana?

A. Yes.

Q. Were you in -- in conversation with anyone else
other than Ileana when she told you that? 01:57

A. Yes, but they're legal folks, so I probably can't
talk about it.

Q. Right.

So I -- I want to make sure I understand what
you're telling me is when Ileana told you that Roger 01:57
overruled Ashley, was that in the presence of counsel?

A. No.

Q. So not because they're talking about them.

So tell me everything else that Ileana told you
on that occasion. 01:57

A. My understanding was that Scott had a
conversation with Roger Theodoredis on the plane back
from New York. When Roger got back, he had a
conversation with Ashley Coleman. And, remember, Ashley
Coleman and Ileana are very good friends from prior jobs 01:58

and this job. So they -- almost all my information from Ileana came from Ashley Coleman, and then Ileana would share it with me. Right? Later, without Ashley there. Sometimes when Ashley was there, but most of the time not. 01:58

And so my understanding was the drama was Ashley was still in the position that she -- that she wanted to take April back. Because that's what you do. And it was overruled.

Q. By Roger? 01:58

A. That's -- that's -- that's my understanding.

And Ashley wasn't happy about it, but at the end of the day, she did her job and she began negotiating with April at that point. Or somebody did.

Q. So in this conversation with Ileana, what did she describe to you was Scott's view in all this? His perspective. 01:58

MS. BULAT: Objection, lacks foundation.

THE WITNESS: So I explained to her -- to her my conversation with Scott. She explained to me her conversation about -- with Ashley. We compared notes. 01:59

BY MR. HALE:

Q. And per Ileana's notes, what was Scott's take on all this?

MS. BULAT: Objection. 01:59

Q. Do you know whether that performance metric manipulation formed a part of John Lopez's termination?
A. I'm not aware of why John was terminated.
Q. You testified before that you ultimately didn't have the authority to terminate April. Was that because 03:12 she was on a leave of absence and returning from a leave?
A. I had no authority to terminate any director at any time. Scott Boatwright was very clear: You have carte blanche to run your business unit. Don't fire or 03:13 promote a director without engaging me.
Q. Did you have the ability to recommend a termination?
A. Yes.
Q. Was the process for terminating somebody on a 03:13 protected leave of absence who was returning, would that have been different from an employee who was not on a protected leave of absence?
A. I don't understand the question.
Q. You understand that April was on a protected 03:13 leave of absence?
A. Yes.
Q. Would the process of terminating April coming back from a protected leave of absence have been different from terminating somebody who wasn't on a 03:13

leave of absence, who was just simply employed?
A. Well, you're allowed to fire people not on protected leaves of absence and you're not allowed to fire somebody on a protected leave of absence. So it's different. 03:14
Q. That's -- that's my question.
What are the differences between your authority to terminate somebody on a protected leave of absence versus somebody who's not, to your best understanding?
A. I didn't have the authority to terminate a director in any case. It all had to be signed off by HR, legal, and Scott. 03:14
Q. And do you disagree that there was a difference between terminating somebody who's on a protected leave of absence versus someone who wasn't? 03:14
A. I disagree about what?
Q. Do you disagree that there was a difference in the process for terminating a team director between somebody who was on a protected leave of absence and somebody who wasn't? Any difference. 03:14
A. Well, I've never experienced a process where somebody was terminated on a protected leave of absence, so I can't speak to that.
Q. Is that because you understand that there are greater protections and approvals that would be 03:15

STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, SUSAN E. BELINGHERI, a Certified Court Reporter for the State of Nevada, do hereby certify;

That on Wednesday, the 2nd day of September, 2026, at the hour of 10:07 a.m. of said day, appeared MARK WATKINS via videoconference, who was duly sworn by me, was thereupon deposed in the matter entitled herein, and that before the proceeding's completion the reading and signing of the deposition has been requested by the deponent or party;

That the foregoing transcript, consisting of pages 1 through 194, is a full, true, and correct transcript of my stenotype notes of said deposition to the best of my knowledge, skill, and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

DATED: At Reno, Nevada, this 15th day of September, 2026.



SUSAN E. BELINGHERI, CCR #655